STATE OF NORTH CAROLINA v. BROWNIE LEE McKEITHAN

No. 49

(Filed 15 December 1977)

1. **Criminal Law § 66.16— in-court identification of defendant—pretrial photographic identification—no taint**

   In a prosecution for the murder of a convenience store employee committed during an armed robbery of the employee, and armed robbery of a customer of the store, the trial court properly allowed an in-court identification of defendant by the customer and properly concluded that the identification was not tainted by unnecessarily suggestive pretrial identification procedures where the evidence tended to show that, on the night of the crimes, the store and parking lot were well lighted; the customer was in the presence of the robber both inside and outside the building for a total of fifteen to twenty minutes; he had ample opportunity to observe the robber who was wearing no mask; the customer observed the robber closely and gave the officers a detailed description of him; the customer viewed numerous photographs on several occasions, but did not find the robber's picture among them; and the customer did identify the robber's photograph from among ten shown him by an officer approximately one month after the crime was committed.

2. **Criminal Law § 87.4— matters brought out on cross-examination—similar questions proper on redirect examination**

   Where defendant's cross-examination of a police officer consisted, in part, of sustained inquiries concerning an alleged accomplice who was charged with the same crime as defendant, defendant could not complain of the district attorney's redirect examination of the officer concerning the accomplice and his role in the alleged crimes.

State v. McKeithan

3. **Criminal Law § 89.4— prior inconsistent statements—admissibility for impeachment purposes**

    The trial court did not err in allowing the district attorney to cross-examine a witness concerning answers he had given prior to trial to questions about his knowledge of and participation in various armed robberies immediately preceding the robbery and murder for which defendant was on trial, since the State contended that the witness's earlier responses were inconsistent with his testimony on direct examination, and prior inconsistent statements of a witness are always admissible for impeachment purposes.

DEFENDANT appeals from judgments of *McKinnon, J.*, 31 January 1977 Session, DURHAM Superior Court.

Defendant was charged in separate bills of indictment with (1) felony murder of Isaac Earl Hedrick, Jr., (2) armed robbery of Isaac Earl Hedrick, Jr., and (3) armed robbery of Lawrence Rogers, the State alleging that all three offenses were committed on 3 October 1975 at the 7-Eleven Store on Highway 54 in Durham County.

This case was first tried before Judge Lee in Durham Superior Court at the 5 May 1976 Session and resulted in a mistrial.

The State's evidence tends to show that Lawrence Rogers, thirty-two years of age, stopped at the Parkwood 7-Eleven Store on Highway 54 on the night of 2 October 1975. Isaac Hedrick, Jr., manager of the store, was there when Rogers arrived. While Mr. Rogers was purchasing a soft drink, a black male entered the store, pulled a gun and said, "I need money." At that time the robber was within two or three feet of Rogers. All the lights were on inside and outside the 7-Eleven Store. The robber wore no mask or hood to obscure his features. Mr. Rogers looked at him, then at Mr. Hedrick, then back at the robber and at that moment the first shot was fired. Mr. Hedrick screamed, grabbed his stomach and went to the floor. The robber ordered Rogers to go around and open the cash register and Rogers did so. There were two cash registers in the store and the one Mr. Rogers opened had no money in it. The robber said, "Not that register, white boy, this other register." Rogers went to the big chrome register and tried to open it but failed. The robber then walked to where Mr. Hedrick lay moaning, put the gun to Hedrick's head and pulled the trigger. Mr. Hedrick stopped moaning and made no further sound. The robber then walked up to Mr. Rogers and in-

quired if he had any money, watches or rings. Rogers gave him $22 in money and offered to write him a check. The robber refused a check, told Rogers to "get back and get down," and Rogers did. The robber then pulled the cash register off the counter and attempted to open it himself but failed. He picked up the cash register and said to Rogers, "Follow me, white boy." Rogers obeyed and they left the store by the front door. The robber carried the cash register into the woods where he told Rogers to carry it further into the woods. It weighed 60 to 70 pounds. Finally Rogers told the robber, "You are going to have to help me with it." When the robber grasped the cash register to assist in carrying it, Mr. Rogers dropped the entire weight on him and ran. The robber fired a shot at Mr. Rogers but missed. Rogers circled through the woods and returned to the 7-Eleven Store where his car was parked. He drove quickly to his home in Parkwood and called the sheriff's office.

Mr. Rogers told the officers there had been a robbery at the Parkwood 7-Eleven Store and a man had been killed. He described the robber as a black male, 5 feet 11 inches to 6 feet in height, moderate complexion, wearing a brown and green checkered flannel shirt, levis and black shoes and having a little goatee.

About five hours later, at 7:15 a.m. on 3 October 1975, Deputy Sheriff Wilkerson brought some photographs to the Rogers home. Over the next several weeks Rogers examined hundreds of photographs of young black males but told Officer Wilkerson that the robber was not among them. Approximately a month later Officer Wilkerson brought a series of ten photographs to Mr. Rogers' home and laid them out on the dining room table. Mr. Rogers examined them, pointed to one photograph and said, "There is the man." It was a photograph of defendant.

Officer Jerry Wilkerson testified he arrived at the 7-Eleven Store on Highway 54 around 1:10 a.m. on the morning of October 3 and found the dead body of Isaac Earl Hedrick, Jr. on the floor behind the counter. He took a statement from Lawrence Rogers, the only eyewitness on the scene, and Mr. Rogers later signed it. It was offered in evidence as State's Exhibit 8 and corroborates the in-court testimony of Rogers.

Officer Wilkerson further testified that he showed Mr. Rogers numerous photographs from time to time, including a microfilm lineup consisting of mugshots on microfilm, but Rogers identified no one. Finally, on 6 November 1975, he took ten photographs, including a picture of defendant, to the Rogers home, lined them up on the dining room table and numbered them from one to ten. He then called Mr. Rogers into the room and asked him to look at the photographic lineup. Mr. Rogers "started looking at them from left to right in numerical order. When he came to the photograph of the defendant, he stated 'this is the man' and backed away from the table. The defendant's photograph was number six in the lineup." These ten photographs were offered in evidence as State's Exhibit 9. Defendant was thereafter arrested and charged with the offenses giving rise to this case.

Officer Wilkerson further testified that a man named Claudie Eugene Cheek was also charged with these offenses but had not been taken. The officer said he was looking for an accomplice who might have been driving the car that night.

Defendant offered evidence but did not testify himself.

Larry Ravon Fleming testified that the officers took him into custody on 3 October 1975 and told him somebody had identified him as the robber who killed "the white man at Parkwood." While being detained at the sheriff's office, this witness testified that a man looked at him and said "he looks like the one." He said the solicitor offered to drop charges against him concerning other robberies in the Durham area if he could "come up with information"; that defendant's name was never mentioned but some man named Cheek was mentioned as a suspect. Thereafter, Fleming said, the only information he heard about the Parkwood robbery "through street sources" was that Cheek was wanted for murder and armed robbery of the 7-Eleven in Parkwood.

Mrs. Mary Shaw, a nurse, testified that defendant is her brother; that on the night of 2 October 1975 at about 8 p.m. he came to her home to get some medicine; that he returned to her house later that night about 11:30 p.m., talked for a while, and went to bed a little after midnight. He had a coughing spell around 1:30 a.m., she got up to give him some cough syrup and aspirin, and he slept on the couch in the living room the remainder of the night.

Mrs. Jenny McLeod testified that defendant is her son; that on Sunday, 5 October 1975, at about 10:15 p.m., defendant left her home in Durham going to Washington, D.C. to get his discharge papers straightened out so he could attend Durham Technical Institute. She said her son had never had a driver's license and does not drive a car. She did not know how he went to Washington except his statement that he rode the bus.

Mrs. Julia Baines testified that on the night of 2 October 1975 from 12:30 a.m. until 1:30 a.m., Claudie Eugene Cheek and his brother James Cheek were at her home in Durham; that a silver and white gun dropped out of Claudie Cheek's pocket as he sat on the sofa; that two weeks later she saw Claudie Cheek again at her home and, having read about the Parkwood killing, she advised Cheek to give himself up; that he had with him the same gun that had fallen out of his pocket on the night of 2 October.

The jury convicted defendant of felony murder of Isaac Earl Hedrick, Jr., armed robbery of Isaac Earl Hedrick, Jr., and armed robbery of Lawrence Rogers. He was sentenced to life imprisonment for the murder to begin at the expiration of a twenty-year sentence imposed for the armed robbery of Lawrence Rogers. Judgment was arrested in the other armed robbery case since it constituted the underlying felony in the felony-murder conviction. Defendant appealed the life sentence directly to the Supreme Court and we allowed motion to bypass the Court of Appeals in the armed robbery case to the end that both cases receive initial appellate review in the Supreme Court.

*Rufus L. Edmisten, Attorney General; Thomas B. Wood. Assistant Attorney General, for the State of North Carolina.*

*Jerry B. Clayton; Robert W. Myrick; Kenneth B. Oettinger, attorneys for defendant appellant.*

HUSKINS, Justice.

[1] Defendant contends his in-court identification by the witness Lawrence Rogers was based on unnecessarily suggestive pretrial identification procedures which violated due process. He therefore argues that the identification testimony of this witness was erroneously admitted. This constitutes his first assignment of error.

A voir dire was conducted at the first trial to determine whether defendant's in-court identification was tainted by prior photographic identification procedures. The testimony of Lawrence Rogers on voir dire tends to show that the 7-Eleven Store on Highway 54 on the night in question was well lighted with overhead fluorescent lights and that the parking lot was well lighted with floodlights; that Rogers was in the presence of the robber, both inside and outside the store building, for a total of fifteen to twenty minutes; that he was very close to the robber and had ample opportunity to observe him while the crimes were being committed; that the robber was wearing no mask or other disguise; that Rogers observed the robber closely and gave the officers a detailed description of him.

Mr. Rogers further testified on voir dire that five hours after the robbery, Officer Wilkerson showed him a number of photographs and he told the officer the robber's picture was not among them. On two other occasions, numerous photographs in groups were shown to the witness and on each occasion he informed the officer that the robber's picture was not among them. On one occasion he went to the Durham Police Department to view suspects singly and informed the officers none of those men was the man who committed the robbery and killed Mr. Hedrick. On another occasion Mr. Rogers went to the police department and viewed literally hundreds of photographs and told the officers he had not seen the photograph of the man who committed the robbery and murder here in question. Finally, on 6 November 1975, Officer Wilkerson carried ten photographs of black males of about the same age to Mr. Rogers' home, laid them out on the table, numbered them from one to ten, then brought Mr. Rogers into the room and asked him to examine them. Mr. Rogers testified: "I viewed it, I would say, at least a minute—thirty seconds or somewhere like that. I did immediately identify him as I looked over those photographs as the man who had robbed me and shot Mr. Hedrick. There is no doubt in my mind now or then. That is the man that killed him sitting over there on the other side of Mr. Jerry Clayton near the end of that table," referring to defendant.

Defendant offered no evidence on voir dire.

Judge Lee made findings of fact substantially in accord with the testimony of Lawrence Rogers and, based thereon, concluded

that no illegal identification procedures were used or suggestions made which would taint the identification of defendant. The court further concluded that the in-court identification of defendant by Lawrence Rogers was of independent origin based solely on what the witness saw at the time of the crimes and did not result from any out-of-court photographic identification or any other pretrial identification procedure suggestive or conducive to mistaken identification. Judge McKinnon adopted these findings and conclusions at this, the second, trial.

"The test under the due process clause as to pretrial identification procedures is whether the totality of the circumstances reveals pretrial procedures so unnecessarily suggestive and conducive to irreparable mistaken identification as to offend fundamental standards of decency, fairness and justice. . . ." *State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10 (1974). Here, the totality of the circumstances indicates that the identification of defendant by Lawrence Rogers was not based on suggestive procedures likely to lead to misidentification. Hence no violation of due process occurred.

Where, as here, the findings and conclusions of the trial court on voir dire are supported by competent evidence, they are conclusive on appeal and must be upheld. *State v. Tuggle*, 284 N.C. 515, 201 S.E. 2d 884 (1974); *State v. Morris*, 279 N.C. 477, 183 S.E. 2d 634 (1971); *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1 (1966).

In the factual context of this case, our holding is supported by many decisions both state and federal, including *Neil v. Biggers*, 409 U.S. 188, 34 L.Ed. 2d 401, 93 S.Ct. 375 (1972); *Simmons v. United States*, 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967 (1968); *United States v. Zeiler*, 447 F. 2d 993 (3d Cir. 1971); *State v. Shore*, 285 N.C. 328, 204 S.E. 2d 682 (1974); *State v. Tuggle*, *supra*; *State v. Lock*, 284 N.C. 182, 200 S.E. 2d 49 (1973); *State v. Knight*, 282 N.C. 220, 192 S.E. 2d 283 (1972).

Defendant's in-court identification by Lawrence Rogers was properly admitted. His first assignment of error is overruled.

[2] In his redirect examination of Officer Wilkerson, the district attorney asked the witness if the officers were looking for an accomplice named Claudie Cheek who was allegedly driving the getaway car the night of the robbery and murder. Over objection Officer Wilkerson replied in the affirmative. In his closing argu-

ment, again over objection, the district attorney argued to the jury that defendant had an accomplice, namely Claudie Cheek, who transported defendant to and from the 7-Eleven Store but remained outside during the robbery and murder. Defendant's timely motions for mistrial due to admission of the challenged evidence and jury argument were overruled. His second assignment of error is based thereon.

The record shows that defendant's cross-examination of Officer Wilkerson consisted, in part, of sustained inquiries concerning Claudie Cheek. These inquiries elicited responses that Cheek was a "prime suspect" in the crime and had been charged with the "identical" crime as that for which defendant was on trial. Defendant's counsel then showed the witness "the bills of indictment of Claudie Cheek, charging him with the same identical crimes in the same identical language as the bills of indictment for defendant." Under such circumstances, defendant may not complain when the district attorney, on redirect examination, inquires as to whether Cheek was being sought as an accomplice to the robbery and murder. "[I]f on cross-examination evidence is developed without objection, the adverse party can offer evidence in reply relating to the same questions, even though such evidence in reply might have been incompetent in the first instance." *Willis v. New Bern*, 191 N.C. 507, 514, 132 S.E. 286, 289 (1926). It has been suggested that the rule stated above should be subject to some limitations and that exercise of the trial court's discretion is frequently necessary. McCormick, Evidence § 57, pp. 131-33 (2d ed. 1972). In the present case, however, we think the subject of the district attorney's redirect examination was entirely proper. Having so held, it is unnecessary to consider defendant's arguments concerning the general question of the admissibility of evidence tending to show the guilt of one other than the accused. The district attorney's jury argument constituted a legitimate exercise of his right to argue the facts in evidence and all legitimate inferences derived therefrom. Defendant's second assignment of error is overruled.

[3] The witness Larry Ravon Fleming testified on direct examination that when he was picked up following the Parkwood robbery and murder, the district attorney questioned him not only about Parkwood but also about the Chesterfield Motel robbery, the Wamble's robbery, "and several more armed robberies."

Fleming swore that he had not been involved in any of those robberies, had no knowledge of them, *and that he told the district attorney so.*

The district attorney was permitted, over objection, to cross-examine Fleming concerning the responses he gave in October 1975 to questions about his knowledge of and participation in various armed robberies immediately preceding the Parkwood robbery and murder, the State contending his earlier responses were inconsistent with his testimony on direct examination. The ruling of the court permitting such cross-examination constitutes defendant's third assignment of error.

Defendant relies on the general rule that in a prosecution for a particular crime the State cannot offer evidence tending to show that the accused has committed another distinct, independent or separate offense, citing *State v. McClain*, 282 N.C. 357, 193 S.E. 2d 108 (1972), and *State v. Hunter*, 290 N.C. 556, 227 S.E. 2d 535 (1976). The rule enunciated and applied in those cases has no application to the facts of this case. Here, the witness Fleming is not the accused and the State's cross-examination of him was not designed, and did not tend, to show that defendant McKeithan had committed other separate crimes. Rather, the challenged cross-examination attacked Fleming's credibility and was designed to impeach his testimony on direct examination.

For impeachment purposes a witness may ordinarily be cross-examined concerning statements he has made on other occasions which are inconsistent with his testimony at the present trial. 1 Stansbury's North Carolina Evidence § 46 (Brandis rev. 1973). Both the State and the defendant have a right to cross-examine a witness to show his interest or bias, *State v. Wilson*, 269 N.C. 297, 152 S.E. 2d 223 (1967), and questions which challenge the credibility of a witness are competent. *State v. Hart*, 239 N.C. 709, 80 S.E. 2d 901 (1954). For purposes of impeachment prior inconsistent statements of a witness are always admissible. *State v. Penley*, 277 N.C. 704, 178 S.E. 2d 490 (1971). *See* 1 Stansbury's North Carolina Evidence § 46 (Brandis rev. 1973). Moreover, "cross-examination is not confined to matters brought out on the direct examination, but questions are permissible to impeach, diminish or impair the credit of the witness. These questions often take a wide range, but should be confined to questions within the bounds of reason—the materiality is largely left to the

discretion of the court." *State v. Dickerson*, 189 N.C. 327, 332, 127 S.E. 256, 259 (1925). Defendant's third assignment of error is overruled.

After careful examination of the entire record we conclude that defendant has had a fair trial free from prejudicial error. The verdicts and judgments must therefore be upheld.

No error.